1

**MIGLIACCIO & RATHOD LLP**
Matthew A. Smith (CA No. 309392)

2
201 Spear St., Ste 1100
San Francisco, CA 94105

3
Tel: (415) 489- 7004
*msmith@classlawdc.com*

4

5
Nicholas Migliaccio, *pro hac vice anticipated*
Jason Rathod, *pro hac vice anticipated*

6
Tyler J. Bean, *pro hac vice anticipated*
412 H St. NE

7
Washington, DC 20002
Tel: (202) 470-3520

8
Fax: (202) 800-2730

9
*nmigliaccio@classlawdc.com*
*jrathod@classlawdc.com*

10
*tbean@classlawdc.com*

11
*Attorneys for Plaintiff and Proposed Class*

12
### UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA

13
DAVID GOULD, individually and on behalf of all others similarly situated,

14

15
                              Plaintiff,

16
            v.

17
CEREBRAL, INC., CEREBRAL MEDICAL GROUP, P.A., and DOES 1 through 100, inclusive,

18

19
                              Defendants.

    )
)
)
)
)
)
)
)
)
)
)
)
)

<u>CASE NO.</u>

<u>JURY TRIAL DEMANDED</u>

20
### CLASS ACTION COMPLAINT

21
    Plaintiff David Gould ("Plaintiff") individually and on behalf of all others similarly situated,

22
through his undersigned counsel, hereby alleges the following against Defendants Cerebral, Inc.,

23
Cerebral Medical Group, P.A., and each contractually affiliated medical group, which are referred to

24
herein as Does 1 through 100 (collectively, "Cerebral"). Facts pertaining to Plaintiff and his personal

25
experiences and circumstances are alleged based upon personal knowledge, and all other facts herein are

26
alleged based upon information and belief, *inter alia*, the investigation of Plaintiff's counsel.

27
### NATURE OF THE ACTION

28
    1.    This is a class action for damages with respect to Defendants for their illegal practice of

disclosing Plaintiff's and Class members' confidential personally identifiable information ("PII") and

protected health information ("PHI") (also referred to herein collectively as "Private Information") to unauthorized third parties, including but not limited to, Meta Platforms, Inc. d/b/a Meta (also referred to herein as "Facebook"), Google, and TikTok.

2. Defendants own and control the website www.cerebral.com (referred to herein as the "Website" or "Defendants' Website"), a website which requires individuals to share highly sensitive PII and PHI in order to create accounts and participate in highly sensitive and personal mental health screenings and receive treatment plans.

3. Defendants installed and implemented "pixels" and similar tracking technologies such as those made available by Facebook, Google, TikTok, and others (referred to herein as the "Pixel") on the Website, which secretly enables the unauthorized transmission and disclosure of Plaintiff and Class Members' PII and PHI as they are communicated to Defendants.

4. Based on Defendants' own admitted use of the Pixel, and the fact that the specific Private Information transmitted via the Pixel was linked to Plaintiff's personal Facebook account (as evidenced by specific targeted ads Plaintiff received beginning soon after his use of Cerebral's Website, as further described below), Plaintiff asserts Defendants also installed and implemented the Facebook Conversions Application Programming Interface ("Conversion API") on the Website.

5. Upon information and belief, Defendants secretly enabled additional unauthorized transmissions and disclosures of Plaintiff's and Class members' PII and PHI by implementing the Conversions API.[1]

6. More specifically, Defendants' Website directs Plaintiff's and Class members' communications to automatically be sent to Facebook's, Google's, and TikTok's servers; this occurs on every webpage in which Defendants installed the Pixel and Conversions API.[2]

---

[1] "Conversions API works with your Facebook Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited: March 7, 2023).

[2] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel … This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." *See* https://developers.facebook.com/docs/marketing-api/conversions-api (last accessed March 7, 2023).

7.      Thus, operating as designed and implemented by Defendants, the Pixel allows the Private Information that Plaintiff and Class members submit to them in confidence to be unlawfully disclosed to Facebook, Google, TikTok, and other third parties alongside the individual's name and other identifying information, including his or her Facebook ID ("FID").

*Tracking Pixel*

8.      A pixel is a piece of code that "tracks the people and the types of actions they take"[3] as they interact with a website, including how long a person spends on a particular webpage, which buttons the person clicks, which pages they view, the text or phrases they type into various portions of the website (such as a general search bar, chat feature, or text box) and more.

9.      Here, Plaintiff's web browser executes the Pixel via instructions within each webpage of Defendants' Website to communicate directly to Facebook, Google, TikTok, and others certain parameters defined by Defendants.

10.     The Pixel can also share the user's Facebook User ID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser.[4] "Cookies" are only transmitted to the owner site from the user's web browser and cannot be accessed by any other site.

11.     The Pixel is programmable, meaning that Defendants control which of the webpages on the Website contain the Pixel, and which events are tracked and transmitted to Facebook.

12.     Pixels are routinely used to target specific customers by utilizing data to build profiles for the purposes of retargeting and future marketing. As Defendants admit in the email notice sent to Plaintiff and Class members on or around March 9, 2023 (the "Notice"), Defendants utilized the Pixel and other tracking technologies since they began operations in October 2019.

---

[3] FACEBOOK, RETARGETING, https://www.facebook.com/business/goals/retargeting (last accessed March 7, 2023).

[4] "Cookies are small files of information that a web server generates and sends to a web browser Cookies help inform websites about the user, enabling the websites to personalize the user experience." *See* https://www.cloudflare.com/learning/privacy/what-are- cookies/ (last accessed March 7, 2023).

13.    Upon information and belief, Defendants used the data they collected from Plaintiff and Class members, without their consent, in an effort to bolster their cash flow.

*Conversions API*

14.    The Facebook Conversions API and similar tracking technologies allow businesses, like Defendants, to send web events, such as clicks, form submissions, keystroke events, and other user actions performed by the user on the Website, from their own servers to Facebook and other third parties.[5]

15.    The Conversions API create a direct and reliable connection between marketing data (such as website events and offline conversations) from Defendants' server to Facebook, Google, TikTok, and other third parties.[6] In doing so, Defendants store Plaintiff's and Class members' Private Information on their own server and then transmit it to these and other unauthorized third parties.

16.    The Conversions API is an alternative method of tracking versus the Pixel because no privacy protections on the user's end can defeat it. This is because it is "server-side implementation" versus execution by users' web browsers.

17.    Because Conversions API is server-side, it cannot access the Facebook Cookie to retrieve the Facebook User ID.[7] Therefore, other round-about methods of linking the user to their Facebook account must be employed.[8]

---

[5] https://revealbot.com/blog/facebook-conversions-api/ (last accessed March 15, 2023).

[6] *See* https://www.facebook.com/business/help/2041148702652965?id=818859032317965 (last accessed March 7, 2023).

[7] "Our systems are designed to not accept customer information that is unhashed Contact Information, unless noted below. Contact Information is information that personally identifies individuals, such as names, email addresses, and phone numbers, that we use for matching purposes only." *See* https://developers.facebook.com/docs/marketing- api/conversions-api/parameters/customer-information-parameters/ (last accessed March 7, 2023).

[8] "Sending additional customer information parameters may help increase Event Match Quality. Only matched events can be used for ads attribution and ad delivery optimization, and the higher the matching quality, the better." https://developers.facebook.com/docs/marketing-api/conversions-api/best-practices/#req- rec-params (last accessed March 7, 2023).

18.    Facebook has an entire page within its developers' website about how to de-duplicate data received when both a pixel is executed, as well as the Conversions API.[9]

19.    Conversions API tracks the user's website interaction, including Private Information being shared, and then transmits this data to Facebook. Facebook markets Conversions API as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."

*This Lawsuit*

20.    Accordingly, Plaintiff brings this lawsuit on behalf of similarly situated individuals whose sensitive Private Information was intentionally, recklessly, and/or negligently disclosed to Facebook, Google, TikTok, and other third parties through Defendants' unauthorized utilization of the Pixel, Conversions API, and other similar tracking technologies.

21.    On or around March 9, 2023, Cerebral notified Plaintiff and over 3 million other Website users of the unauthorized disclosure of their information to third parties like Facebook, Google, and TikTok. Specifically, the Notice states as follows:

**What Happened?**

Like others in many industries, including health systems, traditional brick and mortar providers, and other telehealth companies, Cerebral has used what are called "pixels" and similar common technologies ("Tracking Technologies"), such as those made available by Google, Meta (Facebook), TikTok, and other third parties ("Third Party Platforms"), on Cerebral's Platforms. Cerebral has used Tracking Technologies since we began operations on October 12, 2019. Cerebral recently initiated a review of its use of Tracking Technologies and data sharing practices involving Subcontractors. On January 3, 2023, Cerebral determined that it had disclosed certain information that may be regulated as protected health information ("PHI") under HIPAA to certain Third Party Platforms and some Subcontractors without having obtained HIPAA-required assurances.

**What Information Was Involved?**

[9] *See* https://developers.facebook.com/docs/marketing-api/conversions-api/deduplicate-pixel- and-server-events (last accessed March 7, 2023).

The information disclosed varied depending on what actions you took on Cerebral's Platforms, the nature of the services provided by the Subcontractors, the configuration of Tracking Technologies when you used our services, the data capture configurations of the Third-Party Platforms, how you configured your device and browser, and other factors.

- If you created a Cerebral account, the information disclosed may have included your name, phone number, email address, date of birth, IP address, Cerebral client ID number, and other demographic or information.

- If, in addition to creating a Cerebral account, you also completed any portion of Cerebral's online mental health self-assessment, the information disclosed may also have included your selected service, assessment responses, and certain associated health information.

- If, in addition to creating a Cerebral account and completing Cerebral's online mental health self-assessment, you also purchased a subscription plan from Cerebral, the information disclosed may also have included subscription plan type, appointment dates and other booking information, treatment, and other clinical information, health insurance/ pharmacy benefit information (for example, plan name and group/ member numbers), and insurance co-pay amount.

Out of an abundance of caution, we are notifying anyone who fell into any of these categories, even if they did not become a Cerebral patient or provide any information beyond what was necessary to create a Cerebral account. No matter how you interacted with Cerebral's Platforms, the disclosed information did not include your Social Security number, credit card information, or bank account information.

22.    The Private Information that the Pixel and Conversions API gathered from Defendants' Website and sent to Facebook, Google, and TikTok, among others, included the Private Information that Plaintiff and Class members submitted to Defendants' Website, including for example, particular mental health conditions, types of mental health treatment sought and/or received, name, age, and other confidential PII and PHI.

23.    Facebook, Google, and TikTok in turn sell Plaintiff's and Class members' Private

Information to third-party marketers who geotarget Plaintiff and Class members online (*i.e.*, through

Facebook and other personal accounts) based on communications obtained via the Pixel and

Conversions API.

24.    Here, Plaintiff and Class members submitted sensitive personal and medical information

to Defendants' Website in order to participate in mental health assessments being conducted thereon.

Plaintiff also purchased a subscription from Defendants in order to receive a treatment plan.

25.    Almost immediately thereafter, this information was communicated from the Website to

Facebook, Google, TikTok, and others, as Defendants admits in their Notice.

26.    In sum, Plaintiff and Class members provided their Private Information to Defendants

by creating accounts, completing mental health assessments, and/or creating subscription plans and, at

all times throughout this process, had a reasonable expectation of privacy in the Private Information

Defendants were collecting, including that Defendants would ensure that such Private Information

remain secure and protected and only utilized for limited medical and health purposes.

27.    Defendants further made express and implied promises to protect Plaintiff's and Class

members' Private Information and maintain the privacy and confidentiality thereof.

28.    Defendants owed common law, contractual, statutory, and regulatory duties to keep

Plaintiff's and Class members' Private Information safe, secure, and confidential. Furthermore, by

obtaining, collecting, using, and deriving a benefit from Plaintiff's and Class members' Private

Information, Defendants assumed legal and equitable duties to patients to protect and safeguard their

Private Information from unauthorized disclosure.

29.    Defendants, however, failed in its obligations and promises by utilizing the Pixel and

Conversions API, as described herein, on the Website, knowing that such technology would transmit

and share Plaintiff's and Class members' Private Information with Facebook, Google, TikTok, and other

unauthorized third parties.

30.    While Defendants willfully and intentionally incorporated the Pixel and Conversions API

into the Website, Defendants never disclosed to Plaintiff or Class members that they shared their

sensitive and confidential assessment responses via the Website with third parties. As a result, Plaintiff

and Class members were unaware that their PII and PHI were being surreptitiously transmitted to Facebook and other companies as they participated in the mental health assessments on Defendants' Website.

31.    Defendants breached their obligations in one or more of the following ways: (i) failing to adequately review its marketing programs and web-based technology to ensure the Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share patients' Private Information; (iii) failing to obtain the consent of patients, including Plaintiff and Class members, to disclose their Private Information to Facebook or others; (iv) failing to take steps to block the transmission of Plaintiff's and Class members' Private Information through the Pixel; (v) failing to warn Plaintiff and Class members of such sharing and disclosures; (vi) otherwise failing to design and monitor the Website to maintain the confidentiality and integrity of patients' Private Information.

32.    Plaintiff and Class members have suffered injury as a result of Defendants' conduct. These injuries include (i) invasion of privacy, (ii) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Pixel, (iii) loss of the benefit of the bargain, (iv) diminution of value of the disclosed Private Information, (v) statutory damages, and (vi) the continued and ongoing risk to their Private Information.

Plaintiff seeks to remedy these harms and bring causes of action for (1) Negligence; (2) Invasion of Privacy, (3) unjust enrichment; (4) breach of implied contract; (5) violations of the Electronics Communication Privacy Act (ECPA) 18 U.S.C. § 2511(1) - unauthorized interception, use, and disclosure; (6) violations of ECPA, 18 U.S.C. § 2511(3)(a) - unauthorized interception, use, and disclosure; (7) violations of Title II of the ECPA, 18 U.S.C. § 2702, et seq., - Stored Communications Act; (8) violations of the Computer Fraud and Abuse Act (CFAA), 18 U.S.C. § 1030, et seq.; and (9) breach of confidence.

## **PARTIES**

**A.    Plaintiff David Gould**

33.    Plaintiff is a resident and citizen of the state of New York and brings this action in his individual capacity and on behalf of all others similarly situated.

34.    On multiple occasions beginning in early 2021, Plaintiff utilized Defendants' Website on his computer to create an online account, participate in online mental health assessments being conducted by Defendants, and paid money to receive a treatment plan from Defendants. In order to participate in these health screenings and receive a treatment plan, Plaintiff was required to disclose highly sensitive PII and PHI to Defendants.

35.    Pursuant to the systematic process described in this Complaint, this Private Information that Plaintiff entrusted to Defendants was disclosed to Facebook, Google, TikTok, and other third parties without Plaintiff's knowledge or consent.

36.    Defendants intercepted and/or assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization. By failing to receive such requisite intent, Defendants breached confidentiality and unlawfully disclosed Plaintiff's Private Information.

37.    Plaintiff received the Notice from Cerebral on March 9, 2023 alerting him of these unauthorized disclosures. However, when Plaintiff contacted the helpline in the notice and gave his information over the phone, he soon realized he was speaking with a representative of his then-employer, Broadpath.

38.    Plaintiff immediately felt he could no longer be employed by Broadpath since the act of calling in regarding the Cerebral Notice revealed that he had participated in Cerebral's mental health screenings. Given this unfortunate coincidence, which Defendants could have easily avoided, Plaintiff resigned soon thereafter and was forced to find new employment.

39.    Plaintiff has had a Facebook account since early June of 2009 and an Instagram account since late September of 2012 and currently uses both. After providing his Private Information to Defendants through the Website for various health studies, he immediately began seeing targeted mental health ads as he scrolled through his accounts. Below are screenshots of some of these targeted ads Plaintiff received:

CLASS ACTION COMPLAINT






1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21



22    40.    As a participant in Defendants' mental health screenings, Plaintiff expected that his online

23  communications and responses to these very personal screenings would be kept confidential and that

24  Defendants would not allow such Private Information to be transmitted or intercepted by any third party.

25  Plaintiff also relied on Defendants' Notice of Privacy Practices, which expressly stated that they were

26  "expressly prohibited from using or disclosing your protected health information for marketing

27  purposes," and "permitted and required uses and disclosures will be made only with your consent,

28

authorization, or opportunity to object unless permitted or required by law."[10] But for his status as a patient of Defendants' and Defendants' express and implied promises regarding the security of his Private Information, Plaintiff would not have disclosed such to Defendants.

41.    During his time as an online patient of Defendants', Plaintiff never consented to the unauthorized use of his Private Information by third parties or to Defendants enabling third parties, without Plaintiff's knowledge and consent, to access, interpret, or use such Information.

42.    Notwithstanding, through the Pixel and Conversions API, Defendants transmitted Plaintiff's Private Information to third parties, such as Facebook, Google, and TikTok.

**B.    Defendants**

43.    Defendant Cerebral, Inc. is a mental health telemedicine company with its headquarters located at 340 S. Lemon Ave., Ste 9892 in Walnut, California.

44.    Cerebral focuses on the provision of mental health care and services. On the Website, Defendant touts "mak[ing] high-quality mental health care both accessible and affordable to help you feel better, faster."[11]

45.    Defendant Cerebral Medical Group, P.A. is an affiliate of Cerebral, Inc. which assists Cerebral, Inc. in the provision of mental health services to patients like Plaintiff and Class members.

46.    Defendants identified as Does 1 through 100 are each of Cerebral, Inc.'s and Cerebral Medical Group, P.A.'s contractually affiliated medical groups also assisting in the provision of mental health services to patients like Plaintiff and Class members.

## JURISDICTION AND VENUE

47.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendants. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of

---

[10] *See* Notice of Privacy Practices, https://cerebral.com/privacy-practices (last accessed March 20, 2023).

[11] *See* Our Promise to Our Patients, https://cerebral.com/about-cerebral (last accessed March 20, 2023).

1    the same case or controversy.

2    48.    This Court has personal jurisdiction over Defendants because they operate and maintain

3    their principal place of business in this District. Further, Defendants are authorized to and regularly

4    conduct business in this District and make decisions regarding corporate governance and management of

5    the Website in this District, including decisions regarding the privacy of patients' PII and PHI and the

6    incorporation of the Pixel, Conversions API, and other tracking technologies. By promoting, selling and

7    marketing its telehealth mission to millions of patients nationwide, Defendants intentionally avail

8    themselves of this jurisdiction.

9    49.    Venue is proper in this District under 28 U.S.C. § 1391(a) through (d) because a substantial

10    part of the events giving rise to this action occurred in this District, including decisions made by

11    Defendants' governance and management personnel or inaction by those individuals that led to the

12    unauthorized sharing of Plaintiff's and Class members Private Information; Defendants' principal place

13    of business is located in this District; Defendants collect and redistribute Class members' Private

14    Information in this District; and Defendants caused harm to Class members residing in this District.

15    **FACTUAL ALLEGATIONS**

16    **A.   Defendants Disclosed Plaintiff's and Class Members' Private Information to Facebook
      Using the Pixel and Conversions API Tools**

17    50.    As admitted by Defendants in the Notice sent to Plaintiff and Class members on March

18    9, 2023, Defendants purposely installed the Pixel and Conversion API tools, as well as other tracking

19    technologies, on many, if not all, of the webpages within the Website and programmed those webpages

20    to surreptitiously share patients' private and protected communications with Facebook, Google, TikTok,

21    and others – communications that included Plaintiff's and Class members' Private Information.

22    51.    In order to understand Defendants' unlawful data-sharing practices, it is important to

23    first understand some of the basic web design and tracking tools at issue.

24    Facebook's Business Tools and the Pixel

25    52.    Facebook operates the world's largest social media company and generated $117 billion

26    in revenue in 2021, roughly 97% of which was derived from selling advertising space.[12]

27    ───────────────────

28    [12] Facebook, Meta Reports Fourth Quarter and Full Year 2021 Results,

53.     In conjunction with its advertising business, Facebook encourages and promotes entities and website owners, such as Defendants, to utilize its "Business Tools" to gather, identify, target, and market products and services to individuals.

54.     Facebook's Business Tools, including the Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

55.     The Business Tools are automatically configured to capture "Standard Events" (also known as web events) such as when a user visits a particular webpage, that webpage's Universal Resource Locator ("URL") and metadata, button clicks, etc.[13] Advertisers such as Defendants, can track other user actions and can create their own tracking parameters by building a "custom event."[14]

56.     One such Business Tool is the Pixel, which tracks website users and the types of actions they take. When a user accesses a webpage that is hosting the Pixel, for example, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook's servers – traveling from the user's browser to Facebook's server.

57.     Notably, this transmission only occurs on webpages that contain the Pixel. Thus, Plaintiff's and Class members' Private Information would not have been disclosed to Facebook via the Pixel but for Defendants' decision to install the Pixel on the Website.

58.     Similarly, Plaintiff's and Class members' Private Information would not have been disclosed to Facebook via Conversions API but for Defendants' decision to install and implement that

---

https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth- Quarter-and-Full-Year-2021-Results/default.aspx (last accessed March 13, 2023).

[13] Facebook, Specifications for Facebook Pixel Standard Events, https://www.facebook.com/business/help/402791146561655?id=1205376682832142. (last accessed March 15, 2023); *see also* https://developers.facebook.com/docs/facebook-pixel/advanced/ (last accessed March 15, 2023); https://www.facebook.com/business/help/218844828315224?id=1205376682832142 (last accessed March 15, 2023); https://developers.facebook.com/docs/marketing-api/app- event-api/ (last accessed March 15, 2023).

[14] *See* Facebook, About Standard and Custom Website Events, https://www.facebook.com/business/help/964258670337005?id=1205376682832142 (last accessed March 15, 2023); *see also* https://developers.facebook.com/docs/marketing-api/app- event-api/ (last accessed March 15, 2023), *supra*.

1 tool.

2   59. By installing and implementing these and other tracking tools, Defendants caused

3 Plaintiff's and Class members' communications to be intercepted and transmitted to Facebook, Google,

4 TikTok, and other unauthorized third parties via the Pixel; a second improper disclosure was caused by

5 Defendants' implementation of the Conversions API.

6   60. As explained below, these unlawful transmissions are initiated by Defendants' source

7 code concurrent with communications made via certain webpages.

8   <u>Defendants' Method of Transmitting Plaintiff's and Class Members' Private Information via</u>

9    <u>the Pixel and/or Conversions API</u>

10   61. Web browsers are software applications that allow consumers to navigate the web and

11 view and exchange electronic information and communications over the internet. Each "client device"

12 (such as a computer, tablet, or smartphone) accessed web content through a web browser (*e.g.*, Google's

13 Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

14   62. Every website is hosted by a computer "server" that holds the website's contents and

15 through which server the entity(ies) in charge of the website exchange communications with Internet

16 users' client devices via their web browsers.

17   63. Web communications consist of HTTP or HTTPS Requests and HTTP or HTTPS

18 Responses, and any given browsing session may consist of thousands of individual HTTP requests and

19 HTTP Responses, along with corresponding cookies:

20   a. HTTP Request: an electronic communication sent from the client device's browser to

21    the website's server. GET Requests are one of the most common types of HTTP

22    Requests. In addition to specifying a particular URL (*i.e.*, web address), GET Requests

23    can also send data to the host server embedded inside the URL and can include cookies.

24    POST Requests can send a large amount of data outside of the URL. (For instance,

25    uploading a PDF for filing a motion to a court.)

26   b. Cookies: a small text file that can be used to store information on the client device that

27    can later be communicated to a server or servers. Cookies are sent with HTTP Requests

28    from client devices to the host server. Some cookies are "third-party cookies," which

means they can store and communicate data when visiting one website to an entirely different website.

    c.   HTTP Response: an electronic communication that is sent as a reply to the client device's web browser from the host server in response to an HTTP Request. HTTP Responses may consist of a web page, another kind of file, text information, or error codes, among other data.

64.    A patient's HTTP Request essentially asks the Defendants' Website to retrieve certain information (such as a set of mental health screening questions). The HTTP Response sends the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the participant's screen as they navigate Defendants' Website.

65.    Every website is comprised of Markup and "Source Code." Source Code is a simple set of instructions that commands the website user's browser to take certain actions when the webpage first loads or when a specified event triggers the code.

66.    Source Code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

67.    Defendants' Pixel is Source Code that does just that – acting like a traditional wiretap. When individuals visit Defendants' Website via an HTTP Request to Defendants' server, Defendants' server sends an HTTP Response (including the Markup) that displays the webpage visible to the user, along with Source Code (including Defendants' Pixel). Thus, Defendants are, in essence, handing patients a tapped phone and, once the webpage is loaded into the patient's browser, the software-based wiretap is quietly waiting for private communications on the webpage to trigger the tab, which then intercepts those communications intended only for Defendants and transmits those communications to third parties, including Facebook, Google, TikTok, and others.

68.    Third parties, like Facebook, place third-party cookies in the web browsers of users logged into their services. These cookies uniquely identify the user and are sent with each intercepted communication to ensure the third-party can uniquely identify the user associated with the information intercepted (in this case, highly sensitive Private Information).

69.     With substantial work and technical know-how, internet users can sometimes circumvent this browser-based wiretap technology. This is why third parties bent on gathering Private Information, like Facebook, implement workarounds that even savvy users cannot evade. This workaround, as already discussed herein, is called Conversions API. Conversions API is an effective workaround because it does the transmission from their owner servers and does not rely on the user's web browsers. Thus, the communications between patients and Defendants, which are necessary to achieve the purpose of Defendants' Website, are actually received by Defendants and stored on their server before Conversions API collects and sends the Private Information contained in those communications directly from Defendants to Facebook. Client devices do not have access to host servers and thus cannot prevent (or even detect) this transmission.

70.     While there is no way to confirm with certainty that a web host like Defendants have implemented workarounds like Conversions API without access to the host server, companies like Facebook instruct Website owners like Defendants to "[u]se the Conversions API in addition to the [] Pixel, and share the same events using both tools," because such a "redundant event setup" allows Defendants "to share website events [with Facebook] that the pixel may lose."[15] Defendants have also admitted in their Notice to Plaintiff and the Class to using pixels and other tracking technologies. Thus, it is reasonable to infer that Defendants are utilizing the Conversions API workaround.

71.     The third parties to whom a website transmits data through pixels and associated workarounds do not provide any substantive content relating to the user's communications. Instead, these third parties are typically procured to track user data and communications for marketing purposes of the website owner (*i.e.,* to make money).

72.     Thus, without any knowledge, authorization, or action by a user, website owners like Defendants can use source code to commandeer the user's computing device, causing the device to contemporaneously and invisibly re-direct the users' communications to third parties.

73.     In this case, Defendants employed the Pixel and Conversions API, among other tracking

---

[15] *See* https://www.facebook.com/business/help/308855623839366?id=818859032317965 (last access March 13, 2023).

1    technologies, to intercept, duplicate, and re-direct Plaintiff's and Class members' Private Information to

2    Facebook.

3        74.    In sum, as evidenced by Defendants' own admissions in its Notice to the Class,

4    Defendants' Pixel and other tracking technologies transmitted Plaintiff's and Class members' highly

5    sensitive communications and Private Information to Facebook, Google, TikTok, and other

6    unauthorized third parties, which communications contained private and confidential medical

7    information. These transmissions were performed without Plaintiff's or Class members' knowledge,

8    consent, or express written authorization.

9        75.    Defendants breached Plaintiff's and Class members' right to privacy by unlawfully

10   disclosing their Private Information to Facebook, Google, TikTok, and others. Specifically, Plaintiff and

11   Class members had a reasonable expectation of privacy (based on Defendants' own representations to

12   Plaintiff and the Class that Defendants would not disclose their Private Information to third parties.

13       76.    Specifically, Defendants did not inform Plaintiff that it shared his Private Information

14   with Facebook and other third parties until after such Information had already been disclosed.

15   Moreover, Defendants' Privacy Policy does not state that user and patient Private Information will be

16   shared with Facebook or other unauthorized third parties.

17       77.    By engaging in this improper sharing of information without Plaintiff's and Class

18   members' consent, Defendants breached Plaintiff's and Class members' right to privacy and unlawfully

19   disclosed their Private Information.

20       78.    Upon information and belief, as a "redundant" measure to ensure Plaintiff's and Class

21   members' Private Information was successfully transmitted to third parties like Facebook, Defendants

22   also implemented server-based workarounds like Conversions API to send Plaintiff's and Class

23   members' Private Information from electronic storage on Defendants' server directly to Facebook,

24   Google, TikTok, and others.

25       79.    Plaintiff suffered damages in the form of (a) invasion of privacy; (b) lost time and

26   opportunity costs associated with attempting to mitigate the actual consequences of the invasion of

27   privacy; (c) diminution of value of the Private Information; (d) statutory damages; (e) the continued

28   and ongoing risk to his Private Information; (f) lost benefit of the bargain; and (g) the continued and

CLASS ACTION COMPLAINT

ongoing risk of harassment, spam, and targeted advertisements specific to Plaintiff's medical conditions and other confidential information he communicated to Defendants via the Website.

80.  Plaintiff has a continuing interest in ensuring that future communications with Defendants are protected and safeguarded from future unauthorized disclosure.

**B. Defendants Were Enriched and Benefitted from the Use of the Pixel and other Tracking Technologies that Enabled the Unauthorized Disclosures Alleged Herein**

81.  The sole purpose of the use of the Pixel and other tracking technologies on Defendants' Website was marketing and earning a profit.

82.  In exchange for disclosing the Private Information of their accountholders and patients, Defendants are compensated by Facebook, Google, TikTok and others in the form of enhanced advertising services and more cost-efficient marketing on their platform.

83.  Retargeting is a form of online marketing that targets users with ads based on previous internet communications and interactions. As evidenced by the marketing ad below, Defendants re-targeted their patients (including Plaintiff) and potential patients.



CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12



13
14
15
16
17
18
19
20
21
22
23



24    84.    Thus, by utilizing the Pixel, the cost of advertising and retargeting was reduced, thereby

25    benefiting Defendants.

26                                    **TOLLING**

27    85.    Any applicable statute of limitations has been tolled by the "delayed discovery" rule.

28    Plaintiff did not know – and had no way of knowing – that his Private Information was intercepted and

1   unlawfully disclosed to Facebook because Defendants kept this information secret.

2   **<u>CLASS ALLEGATIONS</u>**

3       86.    This action is brought by the named Plaintiff on his own behalf and on behalf of a

4   proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2),

5   23(b)(3), and 23(c)(4).

6       87.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

7           All persons residing in the United States who received notice from Cerebral that

8           their Private Information was disclosed to third party(ies) without authorization

9           or consent as a result of using Defendants' Website.

10      88.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts

11  claims on behalf of a separate New York Subclass, which is defined as follows:

12          All persons residing the state of New York who received notice from Cerebral

13          that their Private Information was disclosed to third party(ies) without

14          authorization or consent as a result of using Defendants' Website.

15      89.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or

16  other property damage sustained by the Class; and any Judge conducting any proceeding in this action

17  and members of their immediate families.

18      90.    Plaintiff reserves the right to amend the definitions of the Class or add subclasses if

19  further information and discovery indicate that the definitions of the Class should be narrowed,

20  expanded, or otherwise modified.

21      91.    <u>Numerosity.</u> The Class is so numerous that the individual joinder of all members is

22  impracticable. There are at least 3 million patients that have been impacted by Defendants' actions.

23  Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is

24  in the exclusive control of Defendants.

25      92.    <u>Commonality.</u> Common questions of law or fact arising from Defendants' conduct exist

26  as to all members of the Class, which predominate over any questions affecting only individual Class

27  members. These common questions include, but are not limited to, the following:

28

a)   Whether and to what extent Defendants had a duty to protect the Private Information of Plaintiff and Class members;

b)   Whether Defendants had duties not to disclose the Private Information of Plaintiff and Class members to unauthorized third parties;

c)   Whether Defendants violated their own privacy policy by disclosing the Private Information of Plaintiff and Class members to Facebook, Google, TikTok and/or additional third parties;

d)   Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class members that their Private Information would be disclosed to third parties;

e)   Whether Defendants violated the law by failing to promptly notify Plaintiff and Class members that their Private Information was being disclosed without their consent;

f)   Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Private Information;

g)   Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Private Information belonging to Plaintiff and Class members free from unauthorized disclosure;

h)   Whether Defendants violated the statutes asserted as claims in this Complaint;

i)   Whether Plaintiff and Class members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

j)   Whether Defendants knowingly made false representations as to their data security and/or privacy policy practices;

k)   Whether Defendants knowingly omitted material representations with respect to their data security and/or privacy policy practices; and

l)   Whether Plaintiff and Class members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Private Information.

CLASS ACTION COMPLAINT

93.    <u>Typicality</u>. Plaintiff's claims are typical of those of other Class members because Plaintiff's Private Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Pixel and/or Conversions API.

94.    <u>Adequacy</u>. Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

95.    <u>Predominance</u>. Defendants have engaged in a common course of conduct toward Plaintiff and Class members in that all the Plaintiff's and Class members' data was unlawfully stored and disclosed to unauthorized third parties, including Facebook, Google, and TikTok, in the same way. The common issues arising from Defendants' conduct affecting Class members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

96.    <u>Superiority</u>. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications with respect to individual Class members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class member.

97.    Defendants have acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

98.     Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

    a)   Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Private Information and not disclosing it to unauthorized third parties;

    b)   Whether Defendants breached a legal duty to Plaintiff and Class members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

    c)   Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

    d)   Whether Defendants adequately and accurately informed Plaintiff and Class members that their Private Information would be disclosed to third parties;

    e)   Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties;

    f)   Whether Class members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

99.     Finally, all Members of the proposed Class are readily ascertainable. Defendants have access to Class members' names and addresses affected by the unauthorized disclosures that have taken place. Class members have already been preliminarily identified and sent Notice by Defendants.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE
### (On behalf of Plaintiff and the Class)

100.     Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

101.    Upon accepting, storing, and controlling the Private Information of Plaintiff and the Class, Defendants owed, and continue to owe, a duty to Plaintiff and the Class to exercise reasonable care to secure, safeguard and protect their highly sensitive Private Information.

102.    Defendants breached this duty by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information from unauthorized disclosure.

103.    It was reasonably foreseeable that Defendants' failures to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' Private Information through their use of the Pixel, Conversions API, and other tracking technologies would result in unauthorized third parties, such as Facebook, Google, and TikTok, gaining access to such Private Information for no lawful purpose.

104.    Defendants' duty of care to use reasonable measures to secure and safeguard Plaintiff's and Class members' Private Information arose due to the special relationship that existed between Defendants and their patients, which is recognized by statute, regulations, and the common law. Defendants were in a position to ensure that the Website was designed in a way to protect against unauthorized disclosures, not enable them.

105.    In addition, Defendants had a duty under HIPAA privacy laws, which were enacted with the objective of protecting the confidentiality of clients' healthcare information and set forth the conditions under which such information can be used, and to whom it can be disclosed. HIPAA privacy laws not only apply to healthcare providers and the organizations they work for, but to any entity that may have access to healthcare information about a patient that—if it were to fall into the wrong hands—could present a risk of harm to the patient's finances or reputation.

106.    Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class members and their Private Information. Defendants' misconduct included the failure to (1) secure Plaintiff's and Class members' Private Information; (2) comply with industry standard data security practices; (3) implement adequate website and event monitoring; and (4) implement the systems, policies, and procedures necessary to prevent this type of unauthorized disclosure.

107.    As a direct result of Defendants' breach of their duty of confidentiality and privacy and the disclosure of Plaintiff's and Class members' Private Information, Plaintiff and the Class have suffered damages that include, without limitation, loss of the benefit of the bargain, increased

infiltrations into their privacy through spam and targeted advertising they did not ask for, loss of privacy, loss of confidentiality, embarrassment, emotional distress, humiliation and loss of enjoyment of life.

108.    Defendants' wrongful actions and/or inactions and the resulting unauthorized disclosure of Plaintiff's and Class members' Private Information constituted (and continue to constitute) negligence at common law.

109.    Plaintiff and the Class are entitled to recover damages in an amount to be determined at trial.

**COUNT II**
**INVASION OF PRIVACY**
**(On behalf of Plaintiff and the Class)**

110.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

111.    The highly sensitive and personal Private Information of Plaintiff and Class members consists of private and confidential facts and information regarding Plaintiff's and Class members' mental health that were never intended to be shared beyond private communications on the Website and the consideration of health professionals.

112.    Plaintiff and Class members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this Information against disclosure to unauthorized third parties, including Facebook, Google, TikTok, and others.

113.    Defendants owed a duty to Plaintiff and Class members to keep their Private Information confidential.

114.    Defendants' unauthorized disclosure of Plaintiff's and Class members' Private Information to Facebook, Google, and TikTok, third-party tech and marketing giants, is highly offensive to a reasonable person.

115.    Defendants' willful and intentional disclosure of Plaintiff's and Class members' Private Information constitutes an intentional interference with Plaintiff's and Class members' interest in solitude and/or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

- 27 -
CLASS ACTION COMPLAINT

116. Defendants' conduct constitutes an intentional physical or sensory intrusion on Plaintiff's and Class members' privacy because Defendants facilitated Facebook's, Google's, TikTok's, and others unauthorized third parties' simultaneous eavesdropping and wiretapping of confidential communications.

117. Defendants failed to protect Plaintiff's and Class members' Private Information and acted knowingly when they installed the Pixel onto the Website because the purpose of the Pixel is to track and disseminate individual's communications with the Website for the purpose of marketing and advertising.

118. Because Defendants intentionally and willfully incorporated the Pixel into the Website and encouraged individuals to use and interact with the Website and the mental health screenings thereon, Defendants had notice and knew that their practices would cause injury to Plaintiff and the Class.

119. As a proximate result of Defendants' acts and omissions, the private and sensitive Private Information, including PII and PHI of Plaintiff and Class members, was disclosed to at least three known unauthorized third parties, causing Plaintiff and the Class to suffer damages.

120. Plaintiff, on behalf of himself and Class members, seeks compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, loss of time and opportunity costs, lost benefit of the bargain, plus pre-judgment interest and costs.

121. Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendants and still in the possession of Facebook, Google, and TikTok, and the wrongful disclosure of the Private Information cannot be undone.

122. Plaintiff and Class members have no adequate remedy at law for the injuries relating to Defendants' and unauthorized third parties' continued possession of their sensitive and confidential Private Information. A judgment for monetary damages will not undo Defendants' disclosure of the Private Information to unauthorized third parties who, upon information and belief, continue to possess and utilize the Private Information.

123.    Plaintiff, on behalf of himself and Class members, further seeks injunctive relief to enjoin Defendants from intruding into the privacy and confidentiality of Plaintiff's and Class members' Private Information and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT III**
**BREACH OF CONFIDENCE**
**(On behalf of Plaintiff and the Class)**

124.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

125.    Possessors, such as Defendants, of non-public medical information have a duty to keep such medical information completely confidential.

126.    Plaintiff and Class members had reasonable expectations of privacy in the responses and communications entrusted to Defendants through their Website, which responses and communications included highly sensitive Private Information.

127.    Contrary to their duties as telehealth institutions and their express promises of confidentiality, Defendants installed the Pixel and Conversions API to disclose and transmit to third parties Plaintiff's and Class members' Private Information, including data relating to Plaintiff's and Class members' mental health.

128.    These disclosures were made without Plaintiff's or Class members' knowledge, consent, or authorization.

129.    The third-party recipients included, but may not be limited to, Facebook, Google, and TikTok, as admitted by Defendants in their Notice to Plaintiff and the Class.

130.    As a direct and proximate cause of Defendants' unauthorized disclosures of Plaintiff's and Class members' Private Information, Plaintiff and Class members were damaged by Defendants' breach of confidentiality in that (a) sensitive and confidential information that Plaintiff and Class members intended to remain private is no longer private; (b) Plaintiff and Class members face ongoing harassment and embarrassment in the form of unwanted targeted advertisements; (c) Defendants eroded the essential confidential nature of its mental health screenings and treatment plans that Plaintiff and Class members participated in and paid for; (d) general damages for invasion of their rights in an amount to be determined by a jury at trial; (e) nominal damages for each independent violation; (f) the

1  unauthorized use of something of value (the highly sensitive Private Information) that belonged to

2  Plaintiff and Class members and the obtaining of a benefit therefrom without Plaintiff's and Class

3  members' knowledge or informed consent and without compensation to Plaintiff or Class members for

4  the unauthorized use of such data; (g) diminishment of the value of Plaintiff's and Class members'

5  Private Information; and (h) violation of property rights Plaintiff and Class members have in their

6  Private Information.

7                                **COUNT IV**
                          **UNJUST ENRICHMENT**
8                      **(On behalf of Plaintiff and the Class)**

9         131.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth

10  herein.

11        132.    Defendants benefit from the use of Plaintiff's and Class members' Private Information

12  and unjustly retained those benefits at Plaintiff's and Class members' expense.

13        133.    Plaintiff and Class members conferred a benefit upon Defendants in the form of the

14  monetizable Private Information that Defendants collected from them and disclosed to third parties,

15  including Facebook, Google, and TikTok, without authorization and proper compensation.

16        134.    Defendants consciously collected and used this information for their own gain,

17  providing Defendants with economic, intangible, and other benefits, including substantial monetary

18  compensation.

19        135.    Defendants unjustly retained those benefits at the expense of Plaintiff and Class

20  members because Defendants' conduct damaged Plaintiff and Class members, all without providing any

21  commensurate compensation to Plaintiff or Class members.

22        136.    The benefits that Defendants derived from Plaintiff and Class members was not offered

23  by Plaintiff or Class members gratuitously and, thus, rightly belongs to Plaintiff and Class members. It

24  would be inequitable under unjust enrichment principles in New York and every other state for

25  Defendants to be permitted to retain any of the profit or other benefits wrongly derived from the unfair

26  and unconscionable methods, acts, and trade practices alleged in this Complaint.

27

28

1    137.    Defendants should be compelled to disgorge into a common fund for the benefit of

2    Plaintiff and the Class all unlawful or inequitable proceeds that Defendants received, and such other

3    relief as the Court may deem just and proper.

4    **COUNT V**

**VIOLATIONS OF ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA")**
5    **18 U.S.C. § 2511(1) *et seq.* – UNAUTHORIZED INTERCEPTION, USE, AND DISCLOSURE**
6    **(On Behalf of Plaintiff and the Nationwide Class)**

7    138.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth

8    herein.

9    139.    The ECPA protects both sent and received communications.

10    140.    The ECPA, specifically 18 U.S.C. § 2520(a), provides a private right of action to any

11    person whose wire or electronic communications are intercepted, disclosed, or intentionally used in

12    violation of Chapter 119.

13    141.    The transmissions of Plaintiff's and Class members' Private Information to Defendants

14    via Defendants' Website qualifies as a "communication" under the ECPA's definition under 18 U.S.C. §

15    2510(12).

16    142.    The transmission of Private Information between Plaintiff and Class members and

17    Defendants via their Website are "transfer[s] of signs, signals, writing, … data, [and] intelligence of

18    [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or

19    photooptical system that affects interstate commerce" and are therefore "electronic communications"

20    within the meaning of 18 U.S.C. § 2510(2).

21    143.    The ECPA defines "content" when used with respect to electronic communications to

22    "include[] any information concerning the substance, purport, or meaning of that communication." 18

23    U.S.C. § 2510(8).

24    144.    The ECPA defines "interception" as the "acquisition of the contents of any wire,

25    electronic, or oral communication through the use of any electronic, mechanical, or other device" and

26    "contents … include any information concerning the substance, purport, or meaning of that

27    communication." 18 U.S.C. § 2510(4), (8).

28

1    145.    The ECPA defines "electronic, or other device" as "any device … which can be used to

2    intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices"

3    within the meaning of 18 U.S.C. § 2510(5):

        a.    Plaintiff's and Class members' browsers;

        b.    Plaintiff's and Class members' computing devices;

        c.    Defendants' web-servers; and

        d.    The Pixel deployed by Defendants to effectuate the sending and acquisition of user and

              patient sensitive communications.

9    146.    By utilizing and embedding the Pixel on their Website, Defendants intentionally

10   intercepted, endeavored to intercept, and procured another person to intercept, the electronic

11   communications of Plaintiff and Class members, in violation of 18 U.S.C. § 2511(1)(a).

12   147.    Specifically, Defendants intercepted Plaintiff's and Class members' electronic

13   communications via the Pixel, which tracked, stored, and unlawfully disclosed Plaintiff's and Class

14   members' Private Information to Facebook.

15   148.    Defendants' intercepted communications that included, but are not limited to,

16   communications to/from Plaintiff and Class members regarding PII and PHI, including name,

17   Facebook ID, and mental health information relevant to the screenings and treatment plans in which

18   Plaintiff and Class members participated.

19   149.    By intentionally disclosing or endeavoring to disclose the electronic communications of

20   Plaintiff and Class members to Facebook, Google, TikTok and, potentially, other third parties, while

21   knowing or having reason to know that the information was obtained through the interception of an

22   electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. §

23   2511(1)(c).

24   150.    By intentionally using, or endeavoring to use, the contents of the electronic

25   communications of Plaintiff and Class members, while knowing or having reason to know that the

26   Information was obtained through the interception of an electronic communication in violation of 18

27   U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

28

151.    Defendants intentionally intercepted the contents of Plaintiff's and Class members electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State – namely, invasion of privacy, among others.

152.    Defendants intentionally used the wire or electronic communications to increase its profit margins. Defendants specifically used the Pixel and Conversions API to track and utilize Plaintiff's and Class members' Private Information for financial support.

153.    Defendants were not acting under color of law to intercept Plaintiff and Class members' wire or electronic communications.

154.    Plaintiff and Class members did not authorize Defendants to acquire the content of their communications for purposes of invading Plaintiff's and Class members' privacy via the Pixel tracking code.

155.    Any purported consent that Defendants received from Plaintiff and Class members was not valid.

156.    In sending and in acquiring the content of Plaintiff's and Class members' communications relating to the browsing of Defendants' Website, creation of accounts, participation in Defendants' mental health screenings, and/or purchasing as subscription plan, Defendants' purpose was tortious and designed to violate federal and state law, including as described above, a knowing intrusion into a private place, conversation, or matter that would be highly offensive to a reasonable person.

**COUNT VI**
**VIOLATIONS OF THE ECPA**
**18 U.S.C. § 2511(3)(a) – UNAUTHORIZED DIVULGENCE**
**(On Behalf of Plaintiff and the Nationwide Class)**

157.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

158.    The ECPA Wiretap statute provides that "a person or entity providing an electronic communication service to the public shall not intentionally divulge the contents of any communication (other than one to such person or entity, or an agent thereof) while in transmission on that service to any person or entity other than an addressee or intended recipient of such communication or an agent of such addressee or intended recipient." 18 U.S.C. § 2511(3)(a).

159.    An "electronic communication service" is defined as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

160.    Defendants' Website is an electronic communication service in that it gives patients the ability to send electronic communications to Defendants as responses to Defendants' mental health assessments. In the absence of Defendants' Website, internet users could not have submitted such communications in creating their accounts, participating in mental health screenings, and/or signing up for and purchasing subscription plans.

161.    Defendants' Website is a conduit of communication between Plaintiff and Class members and Defendants (and Defendants' health professionals).

162.    Defendants intentionally designed and/or implemented the Pixel and Conversions API tracking and were or should have been aware that such tools could divulge Plaintiff's and Class members Private Information.

163.    Upon information and belief, Defendants' divulgence of the contents of Plaintiff's and Class members' communications was contemporaneous with their exchange with Defendants' Website, to which they directed their communications.

164.    Defendants divulged the contents of Plaintiff's and Class members' electronic communications without authorization. Defendants divulged the contents of Plaintiff's and Class members' communications to Facebook, Google, TikTok, and others without Plaintiff's and Class members' consent and/or authorization.

165.    Exceptions do not apply. In addition to the exception for communications directly to Defendants or an agent of Defendants, the Wiretap Act states that "[a] person or entity providing electronic communication service to the public may divulge the contents of any such communication":

    a.    "as otherwise authorized in section 2511(2)(a) or 2517 of this title";

    b.    "with the lawful consent of the originator or any addressee or intended recipient of such communication";

    c.    "to a person employed or authorized, or whose facilities are used, to forward such communications to its destination"; or

d.    "which were inadvertently obtained by the service provider and which appear to pertain to the commission of a crime, if such divulgence is made to a law enforcement agency." *See* U.S.C. § 2511(3)(b).

166.    Section 2511(2)(a)(i) also provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

167.    Defendants' divulgence of the contents of Plaintiff's and Class members' communications on Defendants' Website to Facebook, Google, TikTok, and other third parties was not authorized by 18 U.S.C. § 2511(2)(a)(i) in that it was neither (a) a necessary incident to the rendition of Defendants' service; nor (b) necessary to the protection of the rights or property of Defendants.

168.    Section 2517 of the ECPA relates to investigations by government officials and has no relevance here.

169.    Defendants' divulgence of the contents of participant communications on Defendants' browser through the Pixel and Conversions API code was not done "with the lawful consent of the originator or any addresses or intended recipient of such communication[s]." As alleged above, (a) Plaintiff and Class members did not authorize Defendants to divulge the contents of their communications; and (b) Defendants did not procure the "lawful consent" from the Website through which Plaintiff and Class members were exchanging their Private Information.

170.    Moreover, Defendants divulged the contents of Plaintiff's and Class members' communications through the Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

171.    The contents of Plaintiff's and Class members' communications did not appear to pertain to the commission of a crime and Defendants did not divulge the contents of their communications to a law enforcement agency.

172.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be  appropriate;  and reasonable  attorneys'  fees  and  other  litigation  costs  reasonably incurred.

<u>COUNT VII</u>
**VIOLATIONS OF TITLE II OF THE ECPA**
**18 U.S.C. § 2702, *et seq.* – STORED COMMUNICATIONS ACT**
**(On Behalf of Plaintiff and the Nationwide Class)**

173.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

174.    The ECPA further provides that "a person or entity providing an electronic communication service to the public shall not knowingly divulge to any person or entity the contents of a communication while in electronic storage by that service." 18 U.S.C. § 2702(a)(1).

175.    The ECPA defines "electronic communication service" as "any service which provides to users thereof the ability to send or receive wire or electronic communications." 18 U.S.C. § 2510(15).

176.    Defendants' Website is a conduit of communication between Plaintiff and Class members and Defendants (and Defendants' researchers) and Defendants business is based, in large part, on the provision of electronic communications.

177.    Defendants intentionally procure and embed various Private Information belonging to Plaintiff and Class members through the Pixel and Conversions API used on Defendants' Website, which qualifies as an electronic communication service.

178.    The ECPA defines "electronic storage" as "any temporary, intermediate storage of a wire or electronic communication incidental to the electronic transmission thereof" and "any storage of such communication by an electronic communication service for purposes of backup protection of  such  communication." 18 U.S.C. § 2510(17).

179.    Defendants store the content of Plaintiff's and Class members' communications with the Website and files associated with it via the Pixel and/or Conversions API. As explained above, via the

Conversions API, Defendants store Plaintiff's and Class members' Private Information on their servers and then transmit that Private Information to Facebook and other third parties.

180. When Plaintiff and/or Class members communicate with the Website via account creation, participation in Defendants' mental health screenings, and/or obtaining subscription plans, the content of such communications is immediately placed into storage.

181. Defendants knowingly divulge the contents of these stored communications through the Website's source code.

182. Section 2702(b) of the Stored Communication Act provides that an electronic communication service provider "may divulge the contents of a communication":

    a. "to an addressee or intended recipient of such communication or an agent of such addressee or intended recipient";

    b. "as otherwise authorized in Section 2517, 2511(2)(a), or 2703 of this title";

    c. "with the lawful consent of the originator or an addressee or intended recipient of such communication, or the subscriber in the case of remote computing service";

    d. "to a person employed or authorized or whose facilities are used to forward such communication to its destination";

    e. "as may be necessarily incident to the rendition of the service or to the protection of the rights or property of the provider of that service";

    f. "to the National Center for Missing and Exploited Children, in connection with a reported submission thereto under section 2258A";

    g. "to law enforcement agency, if the contents (i) were inadvertently obtained by the service provider; and (ii) appear to pertain to the commission of a crime";

    h. "to a governmental entity, if the provider, in good faith, believes that an emergency involving danger of death or serious physical injury to any person requires disclosure without delay of communications relating to the emergency"; or

    i. "to a foreign government pursuant to an order from a foreign government that is subject to an executive agreement that the Attorney General has determined and certified to Congress satisfies Section 2523."

183. Defendants did not divulge the contents of Plaintiff's and Class members' communications to "addressees," "intended recipients," or "agents" of any such addressees or intended recipients of Plaintiff and Class members.

184. Section 2517 and 2703 of the ECPA relate to investigations by government officials and have no relevance here.

185. Section 2511(2)(a)(i) provides:

> It shall not be unlawful under this chapter for an operator of a switchboard, or an officer, employee, or agent of a provider of wire or electronic communication service, whose facilities are used in the transmission of a wire or electronic communication, to intercept, disclose, or use that communication in the normal course of his employment while engaged in any activity which is a necessary incident to the rendition of his service or to the protection of the rights or property of the provider of that service, except that a provider of wire communication service to the public shall not utilize service observing or random monitoring except for mechanical or service quality control checks.

186. Defendants' divulgence of the contents of Plaintiff's and Class members' communications on Defendants' Website to Facebook, Google, TikTok, and others was not authorized by 18 U.S.C. 2511(2)(a)(i) in that such divulgence was neither (a) a necessary incident to the rendition of Defendants' services; nor (b) necessary to the protection of the rights or property of Defendants.

187. Defendants' divulgence of the contents of patients' communications on Defendants' Website was not done "with the lawful consent of the originator or any addresses or intend recipient of such communication[s]." As alleged above, (a) neither Plaintiff nor Class members authorized Defendants to divulge the contents of their communications; and (b) Defendants did not procure the "lawful consent" from the Website through which Plaintiff and Class members were exchanging their Private Information.

188. Moreover, Defendants divulged the contents of Plaintiff's and Class members' communications through the Pixel to individuals who are not "person[s] employed or whose facilities are used to forward such communication to its destination."

189.    The contents of Plaintiff's and Class members' communications did not appear to pertain to the commission of a crime and Defendants did not divulge the contents of their communications to a law enforcement agency.

190.    As a result of the above actions and pursuant to 18 U.S.C. § 2520, the Court may assess statutory damages; preliminary and other equitable or declaratory relief as may be appropriate; punitive damages, if applicable, in an amount to be determined by a jury at trial; and a reasonable attorney's fee and other litigation costs reasonably incurred.

**COUNT VIII**
**VIOLATIONS OF THE COMPUTER FRAUD AND ABUSE ACT ("CFAA")**
**18 U.S.C. § 1030, *et seq.***
**(On Behalf of Plaintiff and the Nationwide Class)**

191.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth herein.

192.    The Plaintiff's and Class members' computers and/or mobile devices are, and at all relevant times have been, used for interstate communication and commerce, and are therefore "protected computers" under 18 U.S.C. § 1030(e)(2)(B).

193.    Defendants exceeded, and continue to exceed, their authorized access by gaining access to Plaintiff's and Class members' protected computers and other electronic devices and obtaining information thereby, in violation of 18 U.S.C. §§ 1030(a)(2), 1030(a)(2)(C).

194.    For example, Defendants accessed Plaintiff's and Class members' Private Information under false pretenses, *i.e.*, by failing to disclose that they were transmitting the Private Information to Facebook, Google, TikTok, and other third parties.

195.    Moreover, Defendants exceeded their unauthorized access in violation of their own Privacy Policies by disclosing Plaintiff's and Class members' Private Information to Facebook, Google, TikTok, and other third parties.

196.    Defendants' conduct caused "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value" under 18 U.S.C. § 1030(c)(4)(A)(i)(I), *inter alia*, due to the secret transmission of Plaintiff's and Class members' Private Information – including their communications

1  and interactions with the Website, URLs of webpages visited, and/or other electronic communications

2  in real-time, which were never intended for disclosure and public consumption.

3      197.    Defendants' conduct also constitutes a "threat to public health or safety" under 18

4  U.S.C. § 1030(c)(4)(A)(i)(IV) due to the sensitive nature of the Private Information of Plaintiff and the

5  Class being made available to Defendants, Facebook, Google, TikTok, and/or other third parties

6  without adequate privacy protections.

7      198.    Accordingly, Plaintiff and the Class are entitled to "maintain a civil action against the

8  violator to obtain compensatory damages and injunctive relief or other equitable relief." *See* 18 U.S.C. §

9  1030(g).

10                          **<u>COUNT VII</u>**
                **VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
11                   **(N.Y. Gen. Bus. Law § 349 *et seq.* (2019))**
                   **(On Behalf of Plaintiffs and the New York Subclass)**
12

13      199.    Plaintiff re-alleges and incorporates by reference the allegations above as if fully set forth

14  herein.

15      200.    New York General Business Law § 349 prohibits deceptive acts or practices in the

16  conduct of any business, trade, or commerce, or in the furnishing of any service in the state of New

17  York.

18      201.    By reason of the conduct alleged herein, Defendants engaged in unlawful practices

19  within the meaning of the N.Y. Gen. Bus. Law § 349. The conduct alleged herein is a "business

20  practice" within the meaning of the N.Y. Gen. Bus. Law § 349, and the deception occurred within New

21  York State.

22      202.    Defendants obtained and stored Plaintiffs' and Class members' Private Information and

23  knew or should have known not to disclose such Private Information to Facebook, Google, TikTok,

24  and other unauthorized third parties through use of the Pixel and other tracking technologies, as alleged

25  herein and as admitted by Defendants in their Notice to Plaintiff and Class members sent March 9,

26  2023.

27

28

1      203.   Plaintiffs and Class members would not have provided their Private Information if they

2  had been told or knew that Defendant would be disclosing such to Facebook, Google, TikTok, and

3  others.

4      204.   As alleged herein in this Complaint, Defendant engaged in the unfair or deceptive acts or

5  practices in the conduct of consumer transactions in violation of N.Y. Gen. Bus. Law § 349, including

6  but not limited to:

7      a.   Representing that its services were of a particular standard or quality that it knew or

8           should have known were of another;

9      b.   Failing to implement and maintain reasonable security and privacy measures to protect

10          Plaintiffs' and Class members' Private Information from unauthorized disclosure;

11     c.   Failing to comply with common law and statutory duties pertaining to the security and

12          privacy of Plaintiffs' and Class members' Private Information, including duties imposed

13          by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTCA"), which

14          prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and

15          enforced by the FTC, the unfair practice of failing to use reasonable measures to protect

16          confidential data, and the Health Insurance Portability and Accountability Act of 1996

17          ("HIPAA"). Defendants' failure was a direct and proximate cause of the unauthorized

18          disclosure of Plaintiff's and Class members' Private Information;

19     d.   Misrepresenting that it would protect the privacy and confidentiality of Plaintiffs' and

20          Class members' Private Information from unauthorized disclosure;

21     e.   Omitting, suppressing, and concealing the material fact that it did not intend to protect

22          Plaintiff's and Class members' Private Information from unauthorized disclosure; and

23     f.   Omitting, suppressing, and concealing the material fact that it did not comply with

24          common law and statutory duties pertaining to the security and privacy of Plaintiffs' and

25          Class members' Personal Information, including duties imposed by the FTCA and

26          HIPAA, which failure was a direct and proximate cause of the unauthorized disclosure.

27

28

205.    Defendants' representations and omissions were material because they were likely to deceive reasonable users of their Website about the adequacy of Defendants' data security and ability to protect the confidentiality of its patients' Private Information.

206.    Such acts by Defendants are and were deceptive acts or practices which are and/or were likely to mislead a reasonable patient into providing his or her Private Information to Defendants. Said deceptive acts and practices are material. The requests for and use of such Private Information in New York through deceptive means occurring in New York were consumer-oriented acts and thereby fall under the New York consumer fraud statute, NYGBL § 349.

207.    In addition, Defendants' failure to secure patients' Private Information violated HIPAA and therefore violates N.Y. Gen. Bus. Law § 349.

208.    Plaintiffs and Class members accordingly seek all monetary and non-monetary relief allowed by law, including actual damages, treble damages, injunctive relief, civil penalties, and attorneys' fees and costs.

209.    The aforesaid conduct violated N.Y. Gen. Bus. Law § 349, in that it is a restraint on trade or commerce.

210.    Defendant's violations of N.Y. Gen. Bus. Law § 349 have an impact and general importance to the public, including the people of New York. Thousands of New Yorkers have had their Private Information stored on Defendants' electronic database, many of whom have been impacted by the unauthorized disclosure disclosed to the Class in the March 2023 Notice.

211.    As a direct and proximate result of these deceptive trade practices, Plaintiffs and Class members are entitled to judgment under N.Y. Gen. Bus. Law § 349, to enjoin further violations, to recover actual damages, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper.

212.    Most, if not all, of the alleged misrepresentations and omissions by Defendants that led to inadequate measures to protect patient information, including Plaintiff's and New York Subclass members' Private Information, occurred within New York.

213.    Defendants' implied and express representations that it would adequately safeguard Plaintiffs' and Class members' Private Information from unauthorized disclosure constitute

representations as to the particular standard, quality, or grade of services that such services did not actually have (as the services were of another, inferior quality), in violation of N.Y. Gen. Bus. Law § 349.

214.    Accordingly, Plaintiff, on behalf of himself and Class members, brings this action under N.Y. Gen. Bus. Law § 349 to seek such injunctive relief necessary to enjoin further violations and recover costs of this action, including reasonable attorneys' fees and other costs.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of himself and the proposed Class, respectfully requests that this Court enter an Order:

a) Certifying this case as a class action on behalf of the Nationwide Class and New York Subclass defined above, appointing Plaintiff as representative of the Class, and appointing his counsel as Class Counsel;

b) For equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or unauthorized disclosure of Plaintiff's and Class members' Private Information;

c) For injunctive relief requested by Plaintiff, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class members;

d) For an award of damages, including but not limited to, actual, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

e) For an award of attorneys' fees and costs, and any other expense, including expert witness fees;

f) Pre- and post-judgment interest on any amounts awarded; and

g) Such other and further relief as this court may deem just and proper.

Dated: March 22, 2023                    Respectfully submitted,

**MIGLIACCIO & RATHOD, LLP**

*/s/ Matthew A. Smith*
Matthew A. Smith
Nicholas A. Migliaccio*
Jason S. Rathod*
Tyler J. Bean*
Tel: 202.470.3520
msmith@classlawdc.com
nmigliaccio@classlawdc.com
jrathod@classlawdc.com
tbean@classlawdc.com

*pro hac anticipated*

**Attorneys for Plaintiff and the Putative Class**